In. re Curtis Norman BERG and Cathryn Yvonne Berg, husband and wife, Debtors.

UNITED STATES of America, acting through the Commodity Credit Corporation, an agency of the United States Department of Agriculture, Creditor-Appellant,

v.

Curtis Norman BERG and Cathryn Yvonne Berg, husband and wife, Debtors-Appellees.

and

In re Thomas NIKOLAISEN and Claudia Nikolaisen, husband and wife, Debtors.

UNITED STATES of America, acting through the Commodity Credit Corporation, an agency of the United States Department of Agriculture, Creditor-Appellant,

v.

Thomas NIKOLAISEN and Claudia Nikolaisen, husband and wife, Debtors-Appellees.

Bankruptcy Nos. 83–05640, 83–05597. Civ. Nos. A2–84–90, A2–84–93.

United States District Court, D. North Dakota, Northeastern Division.

May 25, 1984.

Daniel L. Wentz, Fargo, N.D., for debtors in both cases.

Rodney S. Webb, U.S. Atty., Fargo, N.D., for creditor in both cases.

## MEMORANDUM OF DECISION AND ORDER

BENSON, Chief Judge.

On March 31, 1984, the bankruptcy court, on the motion of the debtors, entered an order in each of the above entitled cases authorizing the use of cash proceeds to be realized from the sale of commodities in which the Commodity Credit Corporation (CCC) holds a current interest. 38 B.R. 267.

CCC has appealed in each case from the bankruptcy court's March 31, 1984 orders. On April 5, 1984 this court entered an order pursuant to Rule 8005 of the Bankruptcy Rules staying the bankruptcy court's orders pending appeal. The debtors then filed a motion for reconsideration of the order granting stay pending appeal which was denied by this court on April 26, 1984. Oral argument on the appeal was heard on May 19, 1984, at which time the court took the matter under advisement.

The Bergs and Nikolaisens are farmers who have filed petitions for reorganization under Chapter 11 of the Bankruptcy Code. On March 15, 1984, they filed motions requesting the use of cash collateral to fund their spring 1984 planting operations. To obtain the needed cash the debtors proposed to sell grain stored on their farm and sealed under loan to CCC in exchange for the granting of a first lien on the 1984 crops and an assignment of Federal Crop Insurance proceeds to CCC. The debtors have sought credit, secured or otherwise, through normal banking and lending facilities, but have been unable to obtain such credit.

CCC has raised the following issues on appeal:

1. Whether the bankruptcy court has jurisdiction under the All Writs Act to issue mandamus-type relief directing the CCC to release its lien;

2. Whether the scheme proposed by the debtors will adequately protect CCC and PCA; and

3. Whether the bankruptcy court's order is inconsistent with statutes

passed by Congress and administered by the Executive Department concerning the authorization of price support programs and whether it violates the implementing regulations thereto.

## JURISDICTION OF THE BANKRUPTCY COURT

CCC argues that in the aftermath of *Northern Pipeline Construction Co. v. Marathon Pipeline Co.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982), the bankruptcy court does not have jurisdiction under the All Writs Act to issue mandamus relief directing it to release its lien. The debtors argue that *Northern Pipeline* did not disturb bankruptcy court jurisdiction over traditional bankruptcy matters dealing with property of the debtor's estate pursuant to 28 U.S.C. § 1471(e) and further that the Emergency Rule referring certain bankruptcy matters to the bankruptcy court enables the bankruptcy court to exercise jurisdiction over these proceedings.

■■■ It is the opinion of this court that the bankruptcy court has jurisdiction to handle the type of proceeding involved in this case. Even if it did not have jurisdiction under 28 U.S.C. § 1471, this is not a related proceeding which, under the Emergency Rule, must be handled by the district court. As stated by the Bankruptcy Court for the Northern District of Ohio, a cash collateral order is one which is at the "core of the federal bankruptcy power" because it has no existence outside a bankruptcy proceeding. *In re Seton-Scherr, Inc.*, 26 B.R. 563, 565 (Bankr.N.D.Ohio 1983). Therefore, an application for an order authorizing the use of cash collateral does not fall within the Emergency Rule's definition of a related proceeding in which the bankruptcy court may only propose an order. *Id.* at 565. Rather, a cash collateral hearing and order are matters over which the bankruptcy court has the authority to perform all acts and duties necessary. *Id.*

## ADEQUATE PROTECTION

■■■ CCC argues that a lien on crops not yet in existence and that are purely speculative in nature as well as being subject to the uncertainties of weather and other natural phenomena, and an assignment of Federal Crop Insurance proceeds will not adequately protect its interests. The debtors argue that adequate protection is not a guaranty. Rather, it is protection against unreasonable risks and is to be decided on a case by case basis. In this case the debtors argue that the indubitable equivalent of the CCC's interests should be determined by looking to practices in the commercial setting. Because lending institutions commonly make loans to farmers secured by a lien on crops to be grown, such a lien, plus an assignment of Federal Crop Insurance proceeds, is the indubitable equivalent of a lien on existing crops.

Section 363 of Title 11, United States Code provides in pertinent part as follows:

Not withstanding any other provision of this section, at any time, on request of an entity that has an interest in property used, sold, or leased, or proposed to be used, sold, or leased, ... the court shall prohibit or condition such use, sale or lease as is necessary to provide adequate protection of such interest. In any hearing under this section ... [the debtor in possession] has the burden of proof on the issue of adequate protection.

11 U.S.C. § 363(e). Pursuant to 11 U.S.C. § 361, adequate protection may be provided by the following means:

(1) requiring the trustee to make periodic cash payments to such entity, to the extent that the stay under section 362 of this title, use, sale, or lease under section 363 of this title, or any grant of a line under section 364 of this title results in a decrease in the value of such entity's interest in such property;

(2) providing to such entity an additional or replacement lien to the extent that such stay, use, sale, lease, or grant results in a decrease in the value of such entity's interest in such property; or

(3) granting such other relief, other than entitling such entity to compensation allowable under section 503(b)(1) of this title as an administrative expense, as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property.

The legislative history makes it clear that "though the creditor might not be able to retain his lien upon the specific collateral held at the time of the filing, the purpose of the section is to insure that the secured creditor receives the value for which he bargained." H.R.Doc. No. 545, 95th Cong., 1st Sess. 39 (1977) as quoted in Appendix, Collier on Bankruptcy, Legislative History 39 (15th ed. 1983). It would therefore appear that the value of a creditor's secured position as it existed at the commencement of the case is to be protected throughout the case.

It is the opinion of this court that an offer of a lien on a crop contemplated to be grown in 1984, plus an assignment of federal crop insurance proceeds is not adequate protection. The cases relied upon by the debtors as authority for the giving of a replacement lien all deal with existing collateral. In this case, rather than providing CCC with collateral of a value that is indubitably equivalent to its interests in the stored grain, the debtors have provided a promise of collateral which may exist in the future. This is, in effect, an offer of no collateral at all. As pointed out at oral argument, the value to a creditor of a lien on an existing crop is greater than the promise of a lien on a crop to be grown. The creditor has the ability to inspect, protect and control existing grain in storage. Additionally, existing collateral is capable of being liquidated at any time, whereas a future crop must first be planted, grown and harvested. Likewise, it may be possible for others to file competing liens against the crop, for example seed, fuel or fertilizer liens, which may or may not have priority over CCC's lien.

It should also be noted that weather, fire, explosions or other disasters could partially or totally destroy the 1984 crop.

Thus, a lien on crops not yet in existence and that are purely speculative in nature as well as being subject to the uncertainties of weather and other natural phenomena is not the indubitable equivalent of a lien on already existing commodities in storage.

Debtors argue that to ensure against uncertainties and to put CCC in a position where it can be virtually certain of recouping its interests in full, the debtors will obtain federal crop insurance and assign the proceeds to CCC. However, federal crop insurance will not insure against management errors or poor husbandry practices. Additionally, it insures only against losses in yield, and not against decreases in the market value of the crop, which may be caused by a decrease in market price or discounting due to poor quality grain. *See generally,* 7 U.S.C. § 1508(a). Additionally, CCC is not a party to the debtors' insurance agreement and should not have its interests dependent on the terms and interpretation of a contractual agreement to which it never intended to be a party.

Because the interests of the CCC will not be adequately protected by a 1984 crop lien and assignment of federal crop insurance proceeds, the order of the bankruptcy court dated March 31, 1984 approving use of cash collateral is reversed.

IT IS SO ORDERED.